Filed 6/24/21  P. v. Ramos CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOEY M. RAMOS,<br><br>    Defendant and Appellant. | D075889<br><br><br>(Super. Ct. No. SCN371166) |


APPEAL from a judgment of the Superior Court of San Diego County, Sim von Kalinowski, Judge.  Reversed in part and remanded with directions.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.


In a prosecution arising from a crime spree that occurred over the course of five months, a jury convicted Joey M. Ramos of 34 separate counts.

Specifically, the jury convicted Ramos of 14 counts of first degree burglary (Pen. Code, § 459)[1] of an inhabited dwelling (§ 460, subd. (a)); one count of attempted first degree burglary (§§ 459, 664); two counts of petty theft (§ 484); one count of unlawfully taking or driving a vehicle (Veh. Code, § 10851, subd. (a)); one count of assault with a firearm (§ 245, subd. (a)(2)); one count of evading an officer with reckless driving (Veh. Code, § 2800.2, subd. (a)); one count of kidnapping (§ 207, subd. (a)); two counts of kidnapping during a carjacking (§ 209.5, subd. (a)); one count of child abuse likely to produce great bodily harm or death (§ 273a, subd. (a)); one count of having a concealed firearm on his person (§ 25400, subd. (a)(2)); one count of having a concealed firearm in a vehicle while being a person prohibited from possessing a firearm (§ 25400, subds. (a)(1), (c)(4)); one count of carrying a loaded firearm on his person or in a vehicle (§ 25850, subd. (a)), knowing it was stolen (§ 25850, subd. (c)(2)); one count of assault with a semiautomatic firearm on a peace officer (§ 245, subd. (d)(2)); two counts of unlawfully possessing ammunition (§ 30305, subd. (a)(1)); two counts of possession of a firearm by a felon (§ 29800, subd. (a)(1)); one count of unlawfully possessing an assault weapon (§ 30605, subd. (a)); and one count of receiving stolen property (§ 496, subd. (a)).

The trial court found that Ramos incurred four prior strikes (§§ 667, subds. (b)-(i), 668, 1170.12), one prior serious felony (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), and one prior prison term (former § 667.5, subd. (b)). After denying Ramos's motion to strike some or all of his prior strikes and his prior serious felony, the trial court imposed an indeterminate sentence of 500 years to life, and a consecutive determinate sentence of 146 years.

---

[1]     Unless otherwise indicated, all further statutory references are to the Penal Code.

2

Ramos contends that (1) insufficient evidence supports 10 of the first degree burglary convictions; (2) the trial court should have stricken some or all of his prior strikes and the five-year enhancement for his prior serious felony to avoid a sentence that violates the proscription in the state and federal Constitutions against cruel and unusual punishment; (3) due to a change in the law after sentencing, the one-year enhancement for his prior prison term should be stricken; (4) three of the counts arising out of illegal possession of the same firearm on the same date should have been stricken in favor of a single count of carrying a loaded firearm on his person or in a vehicle (§ 25850, subd. (a)), knowing it was stolen (§ 25850, subd. (c)(2)); and (5) the trial court violated his constitutional rights by imposing certain fines and fees without determining whether he has the ability to pay them.

We conclude that (1) the one-year enhancement for Ramos's prior prison term should be stricken due to a recent statutory amendment to section 667.5, subdivision (b); (2) Ramos's conviction for possession of a firearm on his person should be stricken pursuant to section 954; and (3) the trial court should hold a hearing to consider whether Ramos has the ability to pay certain fines and fees. We find no merit to Ramos's remaining arguments. We accordingly remand with directions for the trial court to strike the one-year enhancement for the prior prison term and the conviction for having a concealed firearm on his person (§ 25400, subd. (a)(2), count 27), and to consider whether Ramos has the ability to pay certain fines and fees. In all other respects, we affirm the judgment.

3

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Crimes Committed Between May 26 and October 24, 2016*

Many of the counts against Ramos arise from a series of burglaries, petty thefts and an attempted burglary between May 26 and October 24, 2016.  Ramos then committed additional crimes as he attempted to flee from law enforcement as they closed in on him on October 24, 2016, including kidnapping a man and young child in a carjacking.  Ramos also committed several crimes related to his unlawful possession of firearms or ammunition. We describe the relevant incidents in chronological order.

1.     *May 26, 2016 Olson Home Burglary and Vehicle Taking in San Marcos (Counts 1 and 2)*

On May 26, 2016, the Olson family returned from vacation to find that their home in San Marcos had been burglarized and that their dark blue 2016 Dodge Ram pickup truck was missing from the front of the house.  The burglary was first discovered by a friend who was attending to the family's dog at around 5:00 p.m. on the day they returned.  The house was ransacked, and items had been taken, including a Remington shotgun, a pair of Air Jordan shoes, and the keys to the Dodge Ram truck.

Earlier that day, between 11:00 a.m. and noon, a man who lived in the neighborhood saw a dark-colored pickup truck, similar to the Olsons' Dodge Ram, as it sped past with another vehicle following immediately behind it. The truck was coming from the direction of the Olson home.

On August 19, 2016, law enforcement officers located the Olsons' Dodge Ram truck parked on the street near Ramos's residence in Vista.  The truck's license plate was covered with a paper plate from the Bob Baker auto dealership.  Ramos's DNA was found in the truck, and a photograph of

4

Ramos inside the truck was later located on Ramos's cell phone. Call location records show that calls to or from Ramos's cell phone activated cell towers in the general location of the Olson home on the day of the burglary between 10:47 a.m. and 11:58 a.m.

2.  *June 9, 2016 Bristo and Farquharson Home Burglaries in Carlsbad (Counts 3 and 4)*

On the morning of June 9, 2016, two burglaries occurred in the same Carlsbad neighborhood.

The Bristo home was burglarized sometime after 9:15 a.m. The burglar accessed the house through a broken window, ransacked it, and took items worth approximately $50,000, including jewelry, firearms, a bicycle, hair clippers and specialized telecommunications repair tools. The burglar also pulled the emergency cord on the garage door so that it would not open automatically when Mr. Bristo returned home. A man living in the neighborhood saw a dark blue Dodge Ram truck parked near the Bristo home between 9:00 a.m. to 10:00 a.m. The truck had a dealership paper plate covering the license plate.

In April 2017, Mr. Bristo reviewed items at the Escondido Police Department that were recovered from Ramos's storage unit. Mr. Bristo identified his hair clippers and his specialized telecommunications tools as being among those items.

The Farquharson home was burglarized at approximately 11:00 a.m. The burglar accessed the house through a broken window, ransacked it, and took items worth approximately $22,000, including jewelry, watches, purses and shoes. A neighbor's security camera captured video of the burglar between 10:30 a.m. and 11:08 a.m. as he arrived in front of the Farquharson home. The burglar was driving the Dodge Ram truck that was stolen from

5

the Olson home.[2]  As the video shows, the truck parked in front of the Farquharson home, and a man in an orange shirt went toward the house and then emerged minutes later with one of Mr. Farquharson's suitcases, which he put into the truck before driving away.  As visible in the video, the back of the truck held a bicycle that Mr. Bristo identified in court as the bicycle that was taken from his home during the burglary.

Call location records show that calls to or from Ramos's cell phone activated cell towers in the general location of the Bristo and Farquharson homes on the day of the burglaries between 10:24 a.m. and 11:10 a.m.

3.    *June 16, 2016 Ruther Home Burglary in San Diego (Count 5)*

On June 16, 2016, the Ruther home in San Diego was burglarized prior to 6:00 p.m.  The burglar gained access to the house by breaking a window with a rock.  The house was ransacked, and items worth $10,000 to $15,000 were missing, including a Ruger SR40 pistol, a compound bow, outdoor gear, jewelry, cameras, a gaming monitor, and video games.  The burglar also took 5.56 millimeter ammunition that had been delivered that day and left outside the front door.  The burglar pulled the emergency cord on the garage door so it would not open.

In April 2017, Mr. Ruther reviewed items at the Escondido Police Department that were recovered from Ramos's storage unit.  Mr. Ruther identified an arrow case from his compound bow, and he was shown a photograph of 5.56 millimeter ammunition that was still in the box, which he identified as the type that was stolen from him.  On October 24, 2016, when Ramos was arrested, he had the Ruger pistol taken during the Ruther burglary in his possession.

---

[2]    During his testimony, Mr. Olson identified the truck in the security camera video from the Farquharson burglary as his Dodge Ram truck.

6

Call location records show that calls to or from Ramos's cell phone activated cell towers in the general location of the Ruther home on the day of the burglary between 2:10 p.m. and 2:19 p.m.

### 4. *July 28, 2016 Petty Theft in Fallbrook (Count 6)*

On July 28, 2016, a woman who was not at home received an alert on her cell phone from her Ring video doorbell at 12:38 p.m., through which she saw that a man was at her front door, wearing an orange vest and sunglasses. In the video, the Olsons' Dodge Ram truck was visible on the street outside the house.[3] Through the video feed, the woman watched as the man took a package that a delivery driver had earlier placed near the front door. The woman identified Ramos in court as the man she saw on the video feed.

Call location records show that calls to or from Ramos's cell phone activated cell towers in the general location of the Fallbrook home on the day of the theft between 11:16 a.m. and 1:54 p.m.

### 5. *August 1, 2016 Hollingworth Home Burglary in Oceanside (Count 7)*

Sometime between 7:30 a.m. and 8:30 p.m. on August 1, 2016, the Hollingworth home in Oceanside was burglarized. The burglar gained access by breaking a window with a rock and pulled the emergency cord on the garage door so it would not open. Items worth approximately $11,000 were taken during the burglary, including jewelry, at least $2,600 in cash, and 26 collectible Mickey Mantle baseball cards.

Mr. Hollingworth later reviewed items at the Escondido Police Department that were recovered from Ramos's storage unit. Mr.

---

[3] During his testimony, Mr. Olson identified the truck in the Ring video as his Dodge Ram truck.

Hollingworth identified a number of Mickey Mantle baseball cards that belonged to him.

Call location records show that calls to or from Ramos's cell phone activated cell towers in the general location of the Hollingworth home on the day of the burglary between 5:33 p.m. and 7:57 p.m.

6.     *August 2, 2016 Morton Home Burglary in Carlsbad (Count 8)*[4]

On the afternoon of August 2, 2016, the Morton home in Carlsbad was burglarized.  The burglar took jewelry worth between $20,000 to $30,000 and a Volvo station wagon that was parked in the garage.

From 3:09 p.m. to 3:31 p.m., a neighbor's surveillance video captured a dark blue pickup truck driving through the neighborhood and a person in an orange shirt walking toward the Morton home.  Call location records show that calls to Ramos's cell phone activated cell towers in the general location of the Morton home on the day of the burglary at 3:03 p.m. and 3:46 p.m.

On August 10, 2016, the Volvo taken during the Morton burglary was located by law enforcement in Valley Center, parked at a market.  The owner of the market described the person who left the Volvo as someone who did not match Ramos's description.

7.     *August 11, 2016 Axford Home Burglary in Carlsbad (Count 9)*

On August 11, 2016, the Axford home in Carlsbad was burglarized between 10:30 a.m. and 5:00 p.m.  The house was ransacked, and the burglar gained access by breaking a window with a rock.  The items taken during the burglary included $35,000 of jewelry, a screw gun, and a Sawzall power tool.

---

[4]     Ramos was acquitted on this count.

In April 2017, Mr. Axford reviewed items at the Escondido Police Department that were recovered from Ramos's storage unit. Mr. Axford identified his Sawzall power tool taken during the burglary.

Call location records show that calls to or from Ramos's cell phone activated cell towers in the general location of the Axford home on the day of the burglary between 12:19 p.m. and 2:00 p.m.

Around noon on the day of the Axford burglary, a woman who lived in the same neighborhood had an interaction with Ramos after he rang her doorbell and jiggled her front door handle. Ramos claimed to be a landscape supervisor who was contacting the woman to notify her of work taking place that afternoon. The woman spoke with Ramos while looking down on him from a balcony, and she later identified him in court. While speaking with Ramos, the woman noticed a black or very dark blue pickup truck parked in front of her house. A security camera at a house across the street from the woman recorded the Olsons' Dodge Ram truck driving by between 12:05 p.m. to 12:21 p.m.[5]

8.    *August 15, 2016 Raco Home Burglary in San Diego (Count 10)*

On the afternoon of August 15, 2016, the Raco home was burglarized. The house was ransacked, and a window was broken with a rock. Items worth approximately $12,000 were taken, including jewelry, tools, and a designer bag. In April 2017, Mr. Raco reviewed items at the Escondido Police Department that were recovered from Ramos's storage unit. Mr. Raco identified some of his tools taken during the burglary.

---

[5]    During his testimony, Mr. Olson identified the truck in the security camera video taken in the neighborhood of the Axford burglary as his Dodge Ram truck.

Call location records show that calls to Ramos's cell phone activated cell towers in the general location of the Raco home on the day of the burglary at 12:59 p.m. and 1:15 p.m. Ramos's DNA was found on the rock thrown through the window at the Raco home.

9. *August 31, 2016 Helpling Home Burglary in San Marcos (Count 11)*

Sometime between 2:00 p.m. and 4:45 p.m. on August 31, 2016, the Helpling home in San Marcos was burglarized. A window was broken and the house was ransacked. Items that were taken included recording studio equipment, power tools, electronics and $9,000 worth of jewelry. The inside of the home was equipped with Nest video cameras that recorded the burglar, who was wearing a tan colored face covering.

In April 2017, Mr. Helpling reviewed items at the Escondido Police Department that were recovered from Ramos's storage unit. Mr. Helpling identified his power tools and a tool bag taken during the burglary. A tan face covering similar to the face covering worn during the burglary was found in Ramos's truck after he was arrested.

10. *September 5, 2016 Lyons Home Burglary in Encinitas (Count 12)*

On September 5, 2016, at 12:21 p.m., while away from home, Mr. Lyons received a call on his cell phone notifying him that the security alarm at his Encinitas home had been triggered. Police were notified, and Mr. Lyons returned home. A window had been broken with a rock, which landed in the kitchen. No items were missing from inside the home. Video surveillance footage showed that after the alarm was triggered, someone left from the side of the house and then walked across and up the street.

At another house in the neighborhood, which was a three-minute walk from the Lyons home, a man walked up to the front door at 12:29 p.m. The woman who lived there was not at home but received a notification on her cell

10

phone through her Ring video doorbell system that someone was at the door. The woman communicated with the man at her door through the intercom using the Ring application on her phone and asked if she could help him. When the man said he was looking for "David," she told him he had the wrong house, and he walked away. The Ring video was played for the jury, and the woman identified Ramos in court as the person at her door. The man in the Ring video was wearing the same type and color of clothing as the man shown in the surveillance video taken at the Lyons home.

11. *September 14, 2016 Jury Home Burglary in Poway (Count 36)*[6]

On September 14, 2016, the home of the Jury family in Poway was burglarized. Items worth approximately $3,000 were taken.

In April 2017, Mr. Jury reviewed items at the Escondido Police Department that had been recovered from Ramos's storage unit. Mr. Jury identified his Smith & Wesson gun and a backpack that were taken during the burglary.

12. *September 17, 2016 Attempted Burglary in San Diego (Count 13)*

On the morning of September 17, 2016, after ignoring her ringing doorbell several times, a woman saw a man walk into her backyard where he tried to open a window and then went toward a sliding glass door. At that point, the woman made her presence known and motioned to the man to come to the front door to speak with her. The man claimed to be there to take measurements for a fence, although the woman had not ordered a fence. The

---

[6] The People did not charge Ramos with burglary based on the incident at the Jury home, but they relied on it as a possible basis for the charge of receiving stolen property alleged in count 36.

man walked away and got into a Cadillac that had just pulled up.[7] The woman took photographs as the man was leaving. In court, the woman identified Ramos as the man who was at her house.

13. *September 19, 2016 Conrad Home Burglary in San Diego (Count 14)*

On the afternoon of September 19, 2016, between 2:00 p.m. to 5:20 p.m., the Conrad home in San Diego was burglarized. When he arrived home, Mr. Conrad saw a black Ford F-150 pickup truck near the curb,[8] and his garage door would not open. The burglar gained access through a pried-open window. A heavy gun case had been dragged through the house, damaging the floor, and several items were missing from the house, including guns, ammunition and a jewelry box. A dolly/handcart from the garage had been moved to inside the house. Certain of the missing items were later found in a canyon behind the house.

In April 2017, Mr. Conrad reviewed items at the Escondido Police Department that were recovered from Ramos's storage unit. Mr. Conrad identified ammunition and two of his guns taken during the burglary.

Call location records show that calls to or from Ramos's cell phone activated cell towers in the general location of the Conrad home on the day of the burglary between 4:17 p.m. and 5:36 p.m. Ramos's DNA was found on the dolly/handcart that was moved during the burglary.

14. *October 3, 2016 Burglary in Escondido and Assault with a Firearm (Counts 15, 16)*

---

[7] By the time of this incident, law enforcement had already located and impounded the Olsons' Dodge Ram truck used in previous burglaries.

[8] Ramos owned a black Ford F-150 truck.

On October 3, 2016, around 11:00 a.m., a man entered a house in Escondido while no one was home. While the man was still inside the house, a contractor who was doing work on the house arrived and noticed that a man was inside. The man pointed a gun at the contractor, said "Don't move," and then fled outside. The contractor watched the man run up a hill and get into a vehicle. A piece of jewelry was missing from the house. At trial, the contractor identified Ramos as the man who pointed a gun at him.

Call location records show that a call from Ramos's cell phone activated a cell tower in the general location of the incident on October 3, 2016 at 11:43 a.m.

15. *October 13, 2016 Johnson Home Burglary in Encinitas (Count 17)*

On October 13, 2016, at around 2:00 p.m., Mr. Johnson was inside his house in Encinitas when he heard a rock being thrown through a window in the bathroom. The rock landed in a bathtub.

Security camera video from a neighbor's house across the street shows a black Ford F-150 truck driving in and out of the neighborhood. A few minutes later, the video shows a man wearing a fluorescent yellow jacket going into the side yard of the Johnson home near where the window was broken. After almost five minutes, the video shows the man appear again for a few seconds on the side of the Johnson home. Approximately seven minutes later, a black pickup truck is shown on video in the distance as it turns out of an apartment complex in back of the Johnson home.

The truck shown driving in and out of the neighborhood on the security video is identical to Ramos's black Ford F-150 truck, including a distinctive sticker in the passenger window on the driver's side.

A jacket identical to the fluorescent yellow jacket worn by the man in the security video was located in Ramos's truck after he was arrested.

13

16. *October 21, 2016 Hughes Home Burglary in San Marcos (Count 18)*

On October 21, 2016, the Hughes home in San Marcos was burglarized between 9:00 a.m. and 12:45 p.m. A rock had been thrown through a window, and the house was ransacked. A GMC truck was missing from the driveway and several firearms had been taken from the house.

Mr. Hughes reviewed items at the Escondido Police Department that were recovered from Ramos's storage unit. During his testimony, Mr. Hughes could not recall whether he saw any items of his property at the police department. However, Mr. Hughes was then shown a photograph that a detective identified at trial as a Benelli shotgun recovered from Ramos's storage unit. Mr. Hughes testified that the photograph depicted his Benelli shotgun, and he recalled that his ownership of the recovered gun had been verified by reference to its serial number.

Call location records show that calls to or from Ramos's cell phone activated cell towers in the general location of the Hughes home on the day of the burglary at 9:55 a.m. and 10:35 a.m.

17. *October 24, 2016 Burglary in Carlsbad and Petty Theft in Encinitas (Counts 19 and 20)*

Ramos was arrested on the afternoon of October 24, 2016. Earlier that day, a home in Carlsbad was burglarized between 12:15 p.m. and 2:15 p.m., and a package was taken from outside a home in Encinitas.

At the scene where Ramos was arrested on October 24, 2016, law enforcement officers recovered items taken in the Carlsbad burglary earlier that day. When Ramos's Ford F-150 truck was searched after Ramos's arrest, the package taken from the Encinitas home was inside the truck.

18. *The Events Surrounding Ramos's Arrest*

14

By October 19, 2016, law enforcement suspected that Ramos was connected to a series of burglaries, and they commenced surveillance on him. On that day, Ramos was twice seen at an A-1 storage facility in Vista, loading items to or from his truck.[9]

On October 24, 2016, as part of the surveillance operation, two patrol cars were called to respond to the address in Encinitas where Ramos stole the package. Ramos left the location before the patrol cars arrived and encountered them as he drove his Ford F-150 truck through the neighborhood. Ramos evaded the patrol cars by driving straight toward and past them, going the wrong way on a one-way street.

Ramos drove to a nearby shopping center, where he abandoned his truck and forced his way into a vehicle driven by a man with a seven-year-old child in the backseat. At gunpoint, Ramos forced the man to drive him away from the scene. Officers located the vehicle in which Ramos was riding, and the man driving it eventually pulled over when an officer activated his patrol car's siren and lights. Ramos ran from the vehicle, pointing a gun at the officer who was chasing after him. Ramos fell to the ground after the officer fired shots at him, and he was arrested.

The storage unit where Ramos had been observed on October 19, 2016, was searched, as was the hotel room where Ramos had been staying, and his Ford F-150 truck. The storage facility contained a large number of items, which were cataloged and placed in a conference room at the Escondido Police Department. Officers met with the burglary victims at the police department

---

9      Call location records from Ramos's cell phone show that Ramos's phone activated a cell tower in the immediate vicinity of the storage unit on 16 different days between April 7, 2016 and October 21, 2016.

to view the items that had been collected so the victims could identify any property that belonged to them.

19. *The Criminal Proceedings Against Ramos*

An amended indictment charged Ramos with the following 36 counts: 15 counts of first degree burglary (§ 459) of an inhabited dwelling (§ 460, subd. (a)) (counts 1, 3, 4, 5, 7-12, 14, 15, 17-19); one count of attempted first degree burglary (§§ 459, 664) (count 13); two counts of petty theft (§ 484) (counts 6, 20); one count of unlawfully taking or driving a vehicle (Veh. Code, § 10851, subd. (a)) (count 2); one count of assault with a firearm (§ 245, subd. (a)(2)) (count 16); one count of evading an officer with reckless driving (Veh. Code, § 2800.2, subd. (a)) (count 21); two counts of kidnapping to commit robbery (§ 209, subd. (b)(1)) (counts 22, 23); two counts of kidnapping during a carjacking (§ 209.5, subd. (a)) (counts 24, 25); one count of child abuse likely to produce great bodily harm or death (§ 273a, subd. (a)) (count 26); one count of having a concealed firearm on his person (§ 25400, subd. (a)(2)) (count 27); one count of having a concealed firearm in a vehicle while being a person prohibited from possessing a firearm (§ 25400, subds. (a)(1), (c)(4)) (count 28); one count of carrying a loaded firearm on his person or in a vehicle (§ 25850, subd. (a)), knowing it was stolen (§ 25850, subd. (c)(2)), and while armed with a deadly weapon (§§ 667, subd. (e)(2)(C)(iii), 1170.12, subd. (c)(2)(C)(iii)) (count 29); one count of assault with a semiautomatic firearm on a peace officer (§ 245, subd. (d)(2)) (count 30); two counts of unlawfully possessing ammunition (§ 30305, subd. (a)(1)) (counts 31, 33); two counts of possession of a firearm by a felon (§ 29800, subd. (a)(1)) (counts 32, 34); one count of unlawfully possessing an assault weapon (§ 30605, subd. (a)) (count 35); and one count of receiving stolen property (§ 496, subd. (a)) (count 36). For counts

13, 15, and 17, it was alleged that a person other than an accomplice was present in the residence during the commission of the burglary (§ 667.5, subd. (c)(21).) For counts 16, 22 through 25, and 30, it was alleged that Ramos personally and intentionally used a firearm (§ 12022.53, subd. (b)).

It was also alleged that Ramos incurred four prior strikes (§§ 667, subds. (b)-(i), 668, 1170.12), one prior serious felony (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), and one prison prior (former § 667.5, subd. (b)).

The jury convicted Ramos on all of the counts, as alleged, with the following exceptions: (1) the jury reached a not guilty verdict on count 8, which alleged first degree burglary of the Morton home in Carlsbad; (2) the jury could not reach a verdict on count 22, which alleged kidnapping to commit robbery, with the victim being the driver involved in the carjacking;[10] and (3) on count 23, which alleged kidnapping to commit robbery, with the victim being the seven-year-old child involved in the carjacking, the jury found Ramos guilty of the lesser included offense of kidnapping (§ 207, subd. (a)). The trial court found that, as alleged in the amended indictment, Ramos incurred four prior strikes, a prior serious felony and a prison prior.

At sentencing, the trial court denied Ramos's motion, in which he requested that the trial court (1) strike some or all of his prior strikes, and (2) decline to impose the five-year enhancement arising from his prior serious felony conviction. Ramos was sentenced to an indeterminate sentence of 500 years to life, and a consecutive determinate sentence of 146 years.

---

10    Count 22 was subsequently dismissed.

17

II.

DISCUSSION

A.  *Ramos's Challenge to the Sufficiency of the Evidence to Support the*
    *Burglary Convictions in Counts 1, 3, 4, 5, 7, 9, 11, 12, 17 and 18*

Although Ramos was convicted in 34 separate counts, he has identified only 10 counts for which he contends insufficient evidence supports the jury's verdict.  Specifically, Ramos challenges the verdicts of first degree burglary in counts 1, 3, 4, 5, 7, 9, 11, 12, 17 and 18.  Ramos does not challenge the verdict in the two burglary counts in which his DNA tied him to the burglaries (counts 10 and 14), or the one burglary count where an eyewitness to the burglary identified him at trial (count 15).  Nor does Ramos challenge any of the other counts for which he was found guilty for taking or attempting to take items from victims' homes, including the petty thefts, the taking of the Olsons' vehicle and the attempted burglary.

In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . .  We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . .  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . .  'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60, citations omitted.)

In challenging the 10 burglary convictions for insufficient evidence, Ramos presents several arguments that overlap between counts. First, for several counts in which call location records from Ramos's cell phone put him in the general vicinity of the burglaries during the relevant time frame, Ramos contends that the call location records have "minimal" value to support a finding that he committed the burglaries. According to Ramos, the call location data is not probative because it is not exact enough to place him at the specific address of each of the burglaries, and he may have been in the general area of the burglaries for an unrelated reason. Second, although Ramos acknowledges that for six of the challenged counts, victims identified items stolen during those burglaries at the Escondido Police Department, Ramos argues that the evidence at trial did not establish that the stolen items the victims identified at the police department were recovered from his storage unit. Thus, according to Ramos, the victims' identification of the stolen property does not support a finding that he was the burglar. Third, Ramos contends that for the two burglaries in which he threw a rock through a window but did not enter the home, he should not have been found guilty of burglary because insufficient evidence supports a finding that he broke the windows with the intention to commit a theft of items inside the homes.

As we will explain, we conclude that these arguments, as well as other arguments that are specific to certain individual counts, are without merit. Ramos, therefore, has not established that insufficient evidence supports a finding that he committed each of the 10 of the burglaries at issue.

1. *Count 1: Burglary of Olson Home in San Marcos*

The evidence at trial established that on May 26, 2016, the Olson family home was burglarized and a dark blue 2016 Dodge Ram pickup truck was taken, with the keys missing from inside the house. A neighbor saw the

19

truck speeding by between 11:00 a.m. and noon on the day of the burglary. Ramos's cell phone activated cell towers in the general location of the Olson home on the day of the burglary between 10:47 a.m. and 11:58 a.m.

On August 19, 2016, the Olsons' truck was found parked on the street in Vista near Ramos's residence. Ramos does not dispute that the evidence connected him to the recovered truck, as his DNA was found inside it, and a photo on his cell phone depicted him inside the truck.

Moreover, the evidence established that after the date of the Olson burglary, the Olsons' truck was present at four crime locations tied to Ramos. In each instance, Mr. Olson testified in court that his truck was the same vehicle shown in security camera videos from those locations. First, the Olsons' truck was used in both the Farquharson and Bristo burglaries on June 9, 2016. Specifically, the evidence shows the truck was used in those burglaries because a security camera video depicts (1) the Olsons' truck in front of the Farquharson home during the burglary of that home; and (2) a bicycle from the Bristo burglary earlier that morning in the back of the truck.[11] Next, the Olsons' truck was present on July 28, 2016, when Ramos committed a petty theft by taking a package from a house in Fallbrook. The Ring video from that incident shows the Olsons' Dodge Ram truck on the street outside the house.[12] Finally, Ramos was present with the Olsons' truck on August 11, 2016, when he interacted with a woman who later identified him in court as the man who jiggled her front door handle.

[11]    As we will explain when discussing the Farquharson and Bristo burglaries, substantial evidence supports a finding that Ramos committed those crimes.

[12]    On appeal, Ramos does not challenge his conviction for the petty theft, during which he is shown on video with the Olsons' truck.

Despite the foregoing evidence connecting Ramos to the Olson burglary, Ramos contends that insufficient evidence supports the burglary conviction in count 1 for two reasons.

First, Ramos argues that even though he indisputably had possession of the Olsons' truck on August 19, 2016, this was "months after the burglary" of the Olson home on May 26, 2016, and therefore was not " 'recent possession' of stolen property" to support an inference that Ramos was the person who originally took the truck. Relying on case law discussing whether possession of stolen property, without any other corroborating evidence, can support a conviction for possessing stolen property, Ramos argues that "possession of stolen property within three months of the theft is not 'soon after' and cannot alone support an inference Ramos committed the burglary." (See, e.g., *People v. Anderson* (1989) 210 Cal.App.3d 414, 421 (*Anderson*) ["the passage of a long period between the theft and the defendant's possession of the stolen property weakens any inference of guilty knowledge"].) We reject this argument because its fundamental factual premise is flawed. The evidence supports a finding that Ramos had possession of the Olsons' truck long before law enforcement officers located it near his home on August 19, 2016. Indeed, the evidence supports a finding that Ramos used the Olsons' truck to commit the Bristo and Farquharson burglaries on June 9, 2016— only two weeks after the Olson burglary—and that he then continued to use the truck for criminal activity in both July and August 2016.

Ramos's second argument concerns the call location records from his cell phone. As we have explained, those records put Ramos in the general vicinity of the Olson burglary at the time a neighbor saw the Olsons' truck driving by after being stolen. According to Ramos, "The probative value of the cell tower evidence was minimal since it only proved Ramos's cell phone

21

was in the general area around the time of the burglary.  Ramos's residence was near the area of the burglary. . . .  The cell phone could have been in a vehicle traveling along Interstate 78, at a local business, or traveling to and from Ramos's residence at the time of the cell tower activations."  Ramos makes the same general argument for each of the burglaries for which call location data is available, arguing that he "could have been at home, traveling to or from his home on any of the nearby streets or freeways, or visiting any number of businesses in the area of his residence" when the data placed him in the general vicinity of a burglary.

We reject the argument, both with respect to the Olson burglary and with respect to each of the burglaries for which relevant call location data was available.  At trial, an intelligence analyst testified at length about his analysis of the call location data from Ramos's cell phone.  As the analyst explained, because cell towers have a range of up to three miles, the call location records did not enable him to pinpoint Ramos's location to a specific address during the time frame of the burglaries.  However, according to the analyst's testimony, he was able to use the call location records to create a series of maps showing the location of each burglary in comparison to the cell towers that were activated by Ramos's cell phone during the relevant time period.  Each map also shows the location of the burglary in comparison to the location of Ramos's home.  Our review of those maps, which were presented at trial as exhibits, show that for each of the burglaries, Ramos was in a location during the burglaries that is fully consistent with him having committed them.  Accordingly, when combined with other evidence, such as Ramos's possession of property taken during the burglaries, the call location records provide meaningful circumstantial evidence to support a finding that Ramos was the perpetrator of each of the other burglaries for

22

which call location data is available, including the burglary of the Olson home.

In sum, we conclude that substantial evidence supports a finding that Ramos committed the burglary of the Olson home alleged in count 1.

2. *Counts 3 and 4: Burglary of Bristo and Farquharson Homes in Carlsbad*

Both the Bristo and Farquharson homes were burglarized on the morning of June 9, 2016, in the same neighborhood. Substantial evidence presented at trial supports a finding that Ramos committed both burglaries.

With respect to the Bristo burglary, several facts, when taken together, support a finding that Ramos committed the burglary. First, items stolen during the Bristo burglary were found in Ramos's storage unit when it was searched after Ramos's arrest. Second, a security video from near the Farquharson home shows the Bristos' bicycle in the back of the Olsons' truck. The presence of the Bristos' bicycle in the Olsons' truck is significant because, as we have explained, evidence presented at trial connected Ramos to the Olsons' truck.[13] Further, the Olsons' truck was found near Ramos's residence on August 2019 with Ramos's DNA inside of it. Finally, call location records show that Ramos's cell phone activated cell towers in the general location of the Bristo and Farquharson homes on the morning of the burglaries.

With respect to the Farquharson burglary, the evidence supports a finding that Ramos was the perpetrator for several reasons. First, a security camera video shows the Olsons' truck outside the Farquharson home during

---

[13] As we have explained, video camera footage and eyewitness testimony supports a finding that Ramos was present with the Olsons' truck on July 28, 2016, during the petty theft in Fallbrook, and on August 11, 2016, around the time of the Axford burglary.

the burglary, specifically depicting the burglar putting a suitcase taken from the Farquharson home into the truck. This is significant because, as we have explained, other evidence connects Ramos to the Olsons' truck. Second, while parked outside the Farquharson home, the Olsons' truck was carrying the Bristos' bicycle. That fact gives rise to an inference that the same person used the truck to commit both the Bristo burglary and the Farquharson burglary. Significantly, Ramos is tied to the Bristo burglary because items taken during that burglary were found in his storage unit after he was arrested. Finally, as is the case with the Bristo burglary, the call location records from Ramos's cell phone put him in the general location of the burglary.

Ramos makes three arguments in an attempt to establish that the evidence we have set forth above does not sufficiently support a finding of guilt on counts 3 and 4.

First, as is the case with several of the counts he challenges, Ramos contends that the evidence does not support a finding that items taken during the Bristo burglary were found in Ramos's storage unit after he was arrested. Ramos acknowledges that Mr. Bristo testified that he went to the Escondido Police Department in April 2017, where he identified some hair clippers and some specialized telecommunications tools that were taken in the burglary. However, Ramos contends that "[t]he items returned to Bristo were never established as having been recovered during the A-1 Storage Locker search. . . . Ramos's connection to the recovered property was never established by the evidence." As we will explain, we disagree.

In the course of the trial, a series of law enforcement witnesses tied the items that victims viewed at the Escondido Police Department to the items

24

recovered from Ramos's storage unit.[14] First, witness testimony and photographs displayed at trial established that the storage facility contained a large number of items. Next, former Detective Vandervorst of the Escondido Police Department, who was in charge of categorizing, inventorying, and photographing the evidence from the storage unit, testified that all of the items from the storage unit were placed in a conference room at the Escondido Police Department. Further, the testimony established that either Detective Vandervorst or Detective Hurley met with burglary victims at the Escondido Police Department to view the items that had been collected there. Finally, at each such meeting an investigator from the District Attorney's office was also present. When a victim identified property, the investigator wrote the victim's name on a card and took a photograph of the property with the name card next to it.

Mr. Bristo testified that he went to the Escondido Police Department and identified specific items that were taken during the burglary of his home. Further, the evidence at trial included a photograph of those items, with Mr. Bristo's name written on a card, which Mr. Bristo identified at trial as a photograph of the items he identified at the police department. The foregoing evidence and testimony provides substantial evidence to support a finding that items stolen during the Bristo burglary were located in Ramos's storage unit.

---

14 Ramos points out that the storage unit, where the stolen items were recovered, was not registered in his name. However, that fact is not dispositive of whether Ramos used the storage unit to hold items from the burglaries, as officers observed Ramos using the storage unit and Ramos's call location history placed him at or near the location of the storage unit on numerous occasions. Based on those facts, a reasonable juror could conclude that the storage unit belonged to Ramos.

Second, Ramos contends that, even if he is connected to the stolen property taken during the Bristo burglary on June 9, 2016, because the property was not recovered from Ramos's storage unit until approximately four and a half months later, after his October 24, 2016 arrest, his possession of the stolen property was too "attenuated in time to be insufficient to prove he committed the burglary." We are not persuaded. A reasonable juror could conclude that the most plausible explanation for Ramos's possession of the items was that he took them during the burglary. (*Anderson*, *supra*, 210 Cal.App.3d at pp. 421-422 [the jury could find that possession of stolen property four and a half months after a theft was not too remote to support an instruction that possession of " 'recently stolen' " property may, along with any other slight corroborating evidence, support a finding of guilt].) Thus, despite the fact that Ramos's storage unit was not searched until months after the Bristo burglary, the fact that the storage unit contained items from the burglary provides circumstantial evidence which, when combined with other facts, supports a finding that Ramos committed the Bristo burglary.

Third, as he does with the other counts that he challenges, Ramos argues that the call location records from his cell phone do not lend support to a finding of guilt for the Bristo and Farquharson burglaries because the area identified in the call location records is too broad to be useful. As we have explained in connection with the Olson burglary, although they cannot exactly pinpoint Ramos's location to an exact address, the call location records provide further circumstantial support for a finding that Ramos was the perpetrator of the burglaries.

In sum, we conclude that substantial evidence supports a finding that Ramos committed the Bristo and Farquharson burglaries.

26

3.    *Count 5: Burglary of Ruther Home in San Diego*

The Ruther home was burglarized on June 16, 2016. On October 24, 2016, when Ramos was arrested, he was carrying a Ruger pistol taken during the Ruther burglary. Further, an arrow case taken during the Ruther burglary was recovered from Ramos's storage unit. Ramos's cell phone activated cell towers in the general location of the Ruther home during the timeframe of the burglary. Taken together, these facts provide substantial evidence for a finding that Ramos committed the burglary of the Ruther home.

Despite the evidence tying him to the Ruther burglary, Ramos contends that insufficient evidence supports a finding of guilt. First, Ramos argues that although he was in possession of the Ruger pistol at the time of his arrest, the evidence does not establish that the property Mr. Ruther identified at the Escondido Police Department was recovered from Ramos's storage unit. We reject the argument. As we have explained, testimony at trial established that the items recovered from Ramos's storage unit were taken to the Escondido Police Department, and the burglary victims were invited to view them. An investigator took photographs with a name card when a victim identified an item. Mr. Ruther testified that he identified his arrow case at the Escondido Police Department, and the jury was shown a photograph of Mr. Ruther's arrow case with a name card next to it. These facts support an inference that items from the Ruther burglary were in Ramos's storage unit. Further, even without the property found in the storage unit, Ramos's undisputed possession of the Ruger pistol during his arrest provides significant circumstantial evidence tying Ramos to the Ruther burglary.

27

Ramos also argues that (1) his possession of items from the burglary does not support a finding of guilt because the items were not discovered until several months after the burglary; and (2) the call location records are not specific enough to provide any meaningful information to support a verdict of guilt. As we have explained in discussing other counts challenged by Ramos, those arguments are not persuasive, and we reject the arguments for the same reasons set forth above.

4.     *Count 7: Burglary of Hollingworth Home in Oceanside*

The Hollingworth home was burglarized on August 1, 2016. Mickey Mantle baseball cards taken during the Hollingworth burglary were recovered from Ramos's storage unit. Call location records show that Ramos's cell phone activated cell towers in the general location of the Hollingworth home on the day of the burglary. These facts, taken together, provide substantial evidence to support a finding that Ramos committed the Hollingworth burglary.

As with the other burglaries, Ramos contends that the items that Mr. Hollingworth identified at the Escondido Police Department were not tied by any evidence to the items recovered from Ramos's storage unit. We disagree. As we have explained, testimony at trial established that the items recovered from Ramos's storage unit were taken to the Escondido Police Department, and the burglary victims were invited to view them. Mr. Hollingworth testified that he went to the Escondido Police Department and met with Detective Hurley, where he saw his Mickey Mantle baseball cards. During his testimony, Mr. Hollingworth specifically identified a photograph of the baseball cards as depicting the cards stolen during the burglary. Detective Hurley testified that the photograph referenced during Mr. Hollingworth's testimony depicted baseball cards recovered from Ramos's storage unit.

28

These facts support an inference that items from the Hollingworth burglary were found in Ramos's storage unit.

5. *Count 9: Burglary of Axford Home in Carlsbad*

The Axford home was burglarized on August 11, 2016. A Sawzall power tool taken during the Axford burglary was recovered from Ramos's storage unit. Ramos was tied to the neighborhood where the burglary occurred during the relevant timeframe by two items. First, call location records show that Ramos's cell phone activated cell towers in the general location of the Axford home during the time period of the burglary. Second, a woman who lived in the same neighborhood interacted with Ramos after he rang her doorbell and jiggled her front door handle.[15] Taken together, these facts provide substantial evidence to support a finding that Ramos committed the Axford burglary.

Ramos contends that the evidence does not support a finding that the Sawzall power tool that Mr. Axford identified at the Escondido Police Department was one of the items recovered from Ramos's storage unit. We disagree. As we have explained, testimony at trial established that the items recovered from Ramos's storage unit were taken to the Escondido Police Department, and the burglary victims were invited to view them. Mr. Axford testified that he went to the Escondido Police Department, where he looked at items and located his Sawzall power tool. Mr. Axford also confirmed that a

---

[15] Ramos attempts to cast doubt on the woman's identification of him in the Axfords' neighborhood, based on the fact that the woman was wrong about his height and some of the colors on a wrist tattoo, and because she did not identify him in a photographic lineup. However, because the woman identified Ramos in person at trial, there was substantial evidence for the jury to conclude that Ramos was the person the woman saw in the Axfords' neighborhood.

photograph shown at trial was the Sawzall tool that he identified at the police station. That photograph depicts the Sawzall tool with an evidence tag identifying it as Item 33. During Detective Vandervorst's testimony, he identified the Sawzall tool, identified as Item 33, as having been recovered from Ramos's storage unit. That evidence is sufficient to support a finding that the Sawzall power tool taken during the Axford burglary was recovered from Ramos's storage unit.

6. *Count 11: Burglary of Helpling Home in San Marcos*

The Helpling home was burglarized on August 31, 2016. Power tools and a tool bag taken from the Helpling home were recovered from Ramos's storage unit. A Nest camera video from inside the house shows the burglar wearing a tan face covering similar to one that was later found in Ramos's truck, and the appearance of the burglar in the video is consistent with that of Ramos as shown in other photographic exhibits. Taken together, these facts provide substantial evidence to support a finding that Ramos committed the Helpling burglary.

Ramos contends that insufficient evidence supports a finding that the power tools and tool bag that Mr. Helpling identified at the Escondido Police Department were recovered from Ramos's storage unit. We disagree. As we have explained, testimony at trial established that the items recovered from Ramos's storage unit were taken to the Escondido Police Department, and the burglary victims were invited to view them. Mr. Helpling testified that he met with a detective at the Escondido Police Department where he identified power tools and a tool bag that were taken in the burglary. He also confirmed that a photograph shown in court represented the power tools and tool bag that he saw at the police department. That evidence is sufficient to

support a finding that items taken during the Helpling burglary were recovered from Ramos's storage unit.

> 7. *Count 12: Burglary of Lyons Home in Encinitas*

On September 5, 2016, at 12:21 p.m., a rock was thrown through a window at the Lyons home, triggering an alarm. Video surveillance showed a man walking away from the house and up the street after the alarm was triggered. At another house in the neighborhood, which was a three-minute walk from the Lyons home, Ramos was captured on security video at 12:29 p.m. as he interacted with a woman through her Ring video doorbell system. The woman identified Ramos in court as the person at her door. In the Ring video, Ramos wore the same type and color of clothing as the man shown in the video taken from the Lyons home.

Ramos contends that "[t]he evidence was insufficient to prove either that [he] was the person throwing the rock [at the window of the Lyons home] or that the rock was thrown with the intent to steal necessary for burglary." As we will explain, we reject both arguments.

First, substantial evidence supports a finding that Ramos was the person who threw the rock through the window at the Lyons home. Specifically, the burglar at the Lyons home was captured on video as he left the house after the alarm was triggered at 12:21 p.m. Eight minutes later, at 12:29 p.m., Ramos was positively identified at a house in the same neighborhood, and he was shown on video at that house wearing the same clothes as the man shown on video at the Lyons home. Further, the evidence throughout the course of the trial established that Ramos had a practice of gaining access to a home by throwing a rock through a window.[16]

---

[16]  Ramos contends that evidence that rocks were thrown through

Second, "[b]urglary requires an entry into a specified structure with the intent to commit theft or any felony." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077.) Ramos does not dispute that the act of throwing a rock into a house by breaking a window is sufficient to constitute entry into the structure for the purpose of burglary. (*Magness v. Superior Court* (2012) 54 Cal.4th 270, 273.) However, Ramos argues that insufficient evidence supports a finding that the act of throwing a rock at the Lyons home was done with the intent to commit a theft of items inside. The argument lacks merit. "Although the People must show that a defendant charged with burglary entered the premises with felonious intent, such intent must usually be inferred from all of the facts and circumstances disclosed by the evidence, rarely being directly provable." (*People v. Matson* (1974) 13 Cal.3d 35, 41.) The evidence suggests no plausible explanation for why Ramos would have entered a stranger's yard and thrown a rock through a window unless he meant to gain entry. Thus, a reasonable juror could infer that the rock was thrown for the nefarious purpose of attempting to gain access to the house to steal things. That reasonable inference is further supported by evidence that Ramos broke a window with a rock to gain access to many of the homes where he did commit thefts. The fact that Ramos did not actually take any property from the Lyons home is not significant, as the alarm sounded and could have caused him to flee before completing his plan to enter the house.

windows in other burglaries is not probative because "[t]he perpetrator was not identified in any of these incidents." The argument lacks merit. Ramos was found guilty as the perpetrator of all of those burglaries, and, as we have explained, substantial evidence supports a finding of guilt for each of the challenged counts. Moreover, during the burglary of the Raco home, a rock was thrown through the window, which was later found to have Ramos's DNA on it. Ramos does not challenge the jury's finding that he committed the Raco burglary.

Substantial evidence therefore supports a finding that Ramos threw the rock and broke the window at the Lyons home with the intent to commit theft.

8. *Count 17: Burglary of Johnson Home in Encinitas*

On October 13, 2016, a rock was thrown through a window of the Johnson home. Security camera video from across the street showed a black Ford F-150 truck drive in and out of the neighborhood. The truck was identical to Ramos's Ford F-150 truck, including a distinctive sticker in the same location. Several minutes later, a man wearing a fluorescent yellow jacket is shown on video going into the side yard of the Johnson home near where the window was broken, appearing briefly again on the side of the house almost five minutes later. Later, the video depicts a black pickup truck in the distance, where it exits an apartment complex. A jacket that is identical to the fluorescent yellow jacket worn by the man in the security video was located in Ramos's truck after he was arrested. These facts are sufficient to support a finding that Ramos committed a burglary of the Johnson home.

Ramos makes a cursory argument that mirrors his contentions regarding the Lyons burglary. According to Ramos, "[t]he evidence was insufficient to prove either that [he] was the person throwing the rock or that the rock was thrown with the intent to steal necessary for burglary." We are not persuaded.

First, substantial evidence supports a finding that Ramos was the burglar. His Ford F-150 truck was present at the scene of the burglary, and the burglar is shown walking into the Johnson's side yard wearing a jacket that is identical to one located in his truck less than two weeks later after his arrest. Further, the burglar used the same method of throwing a rock through a window that Ramos used in multiple other burglaries.

33

Second, with respect to Ramos's contention that substantial evidence does not support a finding that he threw the rock through the window with the intent to commit theft, we reject that argument for the same reasons set forth in connection with the Lyons burglary.

9.     *Count 18: Burglary of Hughes Home in San Marcos*

The Hughes home was burglarized on October 21, 2016. Among other things, the burglar took several firearms, including two Benelli shotguns. Mr. Hughes provided law enforcement with the serial numbers for his stolen firearms. According to Mr. Hughes's testimony, he went to the Escondido Police Department to review items, but he could not recall whether he saw any items of his property at the police department. However, during his testimony, Mr. Hughes was then shown a photograph that Detective Vandervorst testified was a Benelli shotgun recovered from Ramos's storage unit. Mr. Hughes testified that the photograph depicted his Benelli shotgun, and he recalled that his ownership of the depicted shotgun had been verified by reference to its serial number. Call location records show Ramos's cell phone activated cell towers in the general location of the Hughes home at the time of the burglary. Taken together, these facts provide substantial evidence to support a finding that Ramos committed the Hughes burglary.

Ramos contends that "Hughes's Benelli shotgun was not identified as among the items recovered from the A-1 Storage locker." We disagree. As we have explained, Mr. Hughes was shown a photograph of a Benelli shotgun that was identified by Detective Vandervorst as having been recovered from Ramos's storage locker, and Mr. Hughes recalled that his ownership of the shotgun was verified by reference to its serial number. Those facts are sufficient to tie the Benelli shotgun recovered from Ramos's storage unit to the Benelli shotgun taken during the Hughes burglary.

34

B.      *The Trial Court Properly Denied Ramos's Motion to Strike Some or All of His Prior Strikes and His Prior Serious Felony*

We next consider Ramos's contention that the trial court erred in denying the motion he filed at sentencing, in which he requested that the trial court (1) strike some or all of his prior strikes (§§ 667, subds. (b)-(i), 668, 1170.12) pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529-530 (*Romero*); and (2) decline, in the furtherance of justice, to impose the five-year prior serious felony enhancement that was applicable to each of the current serious felony convictions (§ 667, subd. (a)(1)).

1.      *Procedural Background*

The trial court's finding that Ramos incurred four prior strikes and a prior serious felony were based on convictions in 2004 for burglary with a gang enhancement (§§ 459, 460, 186.22, subd. (b)(1)), two counts of robbery (§ 211), and being a felon in possession of a firearm with a gang enhancement (§§ 12021, subd. (a)(1), 186.22, subd. (b)(1)).  Those convictions were the result of guilty pleas in a case in which Ramos was charged with 16 offenses, including eight counts of residential burglary, three counts of robbery, carjacking, false imprisonment by violence, possession of a firearm by a felon, possession of methamphetamine, and receiving stolen property.  Ramos was paroled from his 12-year prison sentence on those convictions in May 2013 and was discharged from parole in May 2015.  Ramos committed the first of the instant offenses on May 26, 2016.

At sentencing Ramos filed a motion requesting that the trial court strike some or all of his prior strikes, and also that the trial court exercise its discretion to strike the five-year enhancement for his prior serious felony that applied to each current serious felony conviction.  As one basis for the

35

requested relief, Ramos pointed to the length of the sentence he would receive if the motion was denied. Ramos also argued that relief should be granted because the 2004 convictions were remote in time and because, according to Ramos, he was remorseful, and the instant convictions were the result of a drug abuse problem for which he will seek treatment.

For the first time at the sentencing hearing, defense counsel argued that the trial court should strike the prior strikes based on "the constitution[al] issue of cruel and unusual punishment." Defense counsel also argued that, based on constitutional grounds, the court should decline on each of the current serious felony counts to impose the five-year enhancement for Ramos's prior serious felony conviction. As counsel explained, by also imposing numerous five-year enhancements when the indeterminate sentence is already 500 years to life, "it seems like we're just putting on years to make the . . . number so high that it really is just cruel."

The trial court denied the motion. Among other things, the trial court noted that the instant offenses were violent, serious, more "prolific in the nature of criminal activity" than his prior strikes, and involved "over two dozen victims." The trial court also observed that although the prior strikes occurred 13 years before the instant offenses, "the vast majority of this time . . . was spent in state prison." Moreover, the prior strikes involved the use of weapons and occurred over the course of months. Turning to Ramos's additional criminal history, the trial court observed that Ramos had been committing crimes since he was a teenager, and had "never gone more than three years without a conviction except when in prison."

The trial court stated that it "considered the potential of leniency of sentence if some of the strikes were stricken, as suggested by the Defense." However, it determined "based upon the Defendant's criminal history and the

36

crimes he has committed in this case, to ensure society is protected, that the Defendant should be incarcerated for the rest of his life."  The trial court concluded, "Defendant is not outside of [the] Three Strikes scheme spirit and the *Romero* motion is denied.  This is who the Three Strikes law was written for."

With respect to the request that it decline to impose the five-year enhancement for the prior serious felony, the trial court stated that "it would be entirely inappropriate, considering the objectives of sentencing and the circumstances of this case and the Defendant's criminal history. . . to strike any of the [section] 667[, subdivision ](a) . . . enhancements."  In its explanation for this conclusion, the trial court cited the extent of Ramos's crime spree, the number of his victims, the monetary and psychological harm to the victims, Ramos's use of firearms that put victims at risk, the planning and sophistication involved in the crimes, and Ramos's criminal history, which demonstrated he is a danger to society.

### 2.    *Applicable Legal Standards*

A trial court may dismiss prior felony conviction allegations in cases prosecuted under the Three Strikes law when dismissal is "in furtherance of justice." (§ 1385, subd. (a); see *Romero, supra,* 13 Cal.4th at pp. 529-530.)  In deciding whether to dismiss a prior strike, a court considers "whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

37

We apply an abuse of discretion standard when reviewing the trial court's refusal to strike a prior strike. (*People v. Carmony* (2004) 33 Cal.4th 367, 375 (*Carmony*).) "[A] trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances. For example, an abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss . . . or where the court considered impermissible factors in declining to dismiss," or where " 'the sentencing norms [established by the Three Strikes law may, as a matter of law,] produce [ ] an "arbitrary, capricious or patently absurd" result' under the specific facts of a particular case. . . . [¶] But '[i]t is not enough to show that reasonable people might disagree about whether to strike one or more' prior conviction allegations." (*Id.* at p. 378, citations omitted.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.)

A trial court also has discretion to strike a five-year enhancement for a prior serious felony conviction under section 667, subdivision (a)(1) when it is in furtherance of justice. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971 ["Senate Bill 1393 . . . , effective January 1, 2019, amends sections 667[, subd.] (a) and 1385[, subd.] (b) to allow a court to exercise its discretion to strike or dismiss a prior serious felony conviction for sentencing purposes. (Stats. 2018, ch. 1013, §§ 1-2.)"]; *People v. Shaw* (2020) 56 Cal.App.5th 582, 586 [the statutory amendment "give[s] courts power to strike the five-year prior serious felony enhancement 'in furtherance of justice' "].) Case law and legislative history indicate that courts "must evaluate the nature of the offense and the offender in deciding whether to strike a nickel prior [i.e., a five-year enhancement for a prior serious felony]." (*Shaw*, at p. 586.) As with our review of a decision on a motion to strike a prior strike, "[w]e review a

court's decision to deny a motion to strike a five-year prior serious felony enhancement for an abuse of discretion." (*Id.* at p. 587.)

3. *The Trial Court Properly Denied Relief, Despite Defense Counsel's Contention That the Resulting Sentence Constitutes Cruel and Unusual Punishment*

On appeal, Ramos relies solely on the issue of cruel and unusual punishment in challenging the trial court's denial of relief. Ramos points to the sentence imposed in this case: an indeterminate sentence of 500 years to life, and a consecutive determinate sentence of 146 years. He argues, "Ramos was 37 years old at the time of sentencing[.] [T]he trial court could have exercised its sentencing discretion to strike the prior allegations . . . for many (if not all) of the prior convictions and stricken the punishment for all or most of the five-year serious felony prior enhancements. This would have subjected Ramos to a sentence equivalent to a life sentence, which made him ineligible for parole before an age no human being could reach. In these circumstances, the trial court should have imposed a sentence of 75 years to life, rather than the sentence of 646 years to life the trial court imposed, and the failure to do so constitutes cruel and unusual punishment." Ramos argues, "Faced with a choice ranging from 75 years to life to 644 years to life, the trial court here should have imposed the lesser sentence which, while still impossible for Ramos to serve, is at least more within the range of reality than the sentence the trial court actually imposed." Ramos's argument is premised solely on the fact that the length of his sentence is more than he can serve in a lifetime. He does not attempt to argue that the nature of his crimes or his criminal history provide a basis for striking his prior strikes or declining to impose the prior serious felony enhancement.

To support this argument, Ramos relies on Justice Mosk's concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585, at pages 600 to 602. In his

39

concurrence, Justice Mosk expressed the view that a sentence of 111 years in prison "is impossible for a human being to serve, and therefore violates" the cruel and unusual punishment clause of the federal and state Constitutions. We reject Ramos's reliance on Justice Mosk's concurrence as it has no precedential value and the other justices did not join it. (See *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231 (*Retanan*) [rejecting appellant's attempt to rely on Justice Mosk's concurrence in *Deloza*]; *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383 [noting that Justice Mosk's concurring opinion in *Deloza* has no precedential value and disagreeing with Justice Mosk's analysis].) As one court has explained in rejecting Justice Mosk's analysis, "[I]t is immaterial that defendant cannot serve his sentence during his lifetime. In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution [citation] or the federal Constitution." (*Byrd,* at p. 1383.) Further, in numerous instances, courts have rejected constitutional challenges to sentences that would not be possible for the defendant to complete during the span of a lifetime. (See, e.g., *Byrd,* at p. 1376 [sentence of 115 years plus 444 years to life]; *Retanan,* at p. 1222 [sentence of 135 years to life]; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 572-573 (*Sullivan*) [sentence of 210 years to life]; *People v. Wallace* (1993) 14 Cal.App.4th 651, 666 (*Wallace*) [sentence of 283 years and eight months]; *People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1134-1137 [sentence of 375 years to life plus 53 years].)

Instead of focusing on whether a defendant will be able to complete a sentence during his lifetime as suggested in Justice Mosk's concurrence, the

applicable case law directs us to focus on whether the sentence is grossly disproportionate to the defendant's crimes. A sentence violates the California Constitution's prohibition against cruel and unusual punishment if " 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 478.) The Eighth Amendment to the federal Constitution "contains a 'narrow proportionality principle,' that 'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*Graham v. Florida* (2010) 560 U.S. 48, 59-60 (*Graham*).) "[O]nly in the 'exceedingly rare' and 'extreme' case" will a sentence be grossly disproportionate to the crime. (*Lockyer v. Andrade* (2003) 538 U.S. 63, 73.)

Under the California Constitution, "[t]he three techniques often suggested for determining if punishment is cruel and unusual are (1) the nature of the offense and the offender with regard to the degree of danger present to society, (2) comparison of the challenged punishment with the punishment prescribed for more serious crimes in the jurisdiction, and (3) comparison of the challenged punishment with punishment for the same offense in other jurisdictions." (*People v. Russell* (2010) 187 Cal.App.4th 981, 993, citing *In re Lynch* (1972) 8 Cal.3d 410, 425-427 (*Lynch*).) A similar approach is used for a federal constitutional challenge.[17]

_____

[17]    To decide whether a sentence violates the Eighth Amendment to the federal Constitution, "a court must begin by comparing the gravity of the offense and the severity of the sentence." (*Graham, supra,* 560 U.S. at p. 60.) Similar to the inquiry under the California Constitution into "the nature of the offense and/or the offender" (*Lynch, supra,* 8 Cal.3d at p. 425), "[i]n determining the gravity of [the defendant's] conduct in evaluating an Eighth Amendment challenge to a sentence imposed under a recidivist sentencing

"Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496.) Our analysis "commences with great deference to the Legislature. Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches. [Citations.] Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive." (*Id.* at p. 494.)

Turning to "the nature of the offense" (*Lynch, supra,* 8 Cal.3d at p. 425), we observe that Ramos's crimes were of a serious nature. Specifically, Ramos was convicted of numerous counts of first degree burglary that occurred over the course of five months and involved many victims. He capped off this crime spree with a kidnapping, carjacking and assault on a law enforcement officer. The offenses caused significant harm to the victims, and Ramos used a firearm in the course of committing several of them. (See *Sullivan*, *supra*, 151 Cal.App.4th at p. 570 [for the purpose of the inquiry into the constitutionality of a sentence of 210 years to life, the "[c]ommission of a series of robberies which included threatened acts of violence with a deadly

statute, we must consider not only [the defendant's] triggering offense but also the nature and extent of [the defendant's] criminal history." (*In re Coley* (2012) 55 Cal.4th 524, 562.) Under the federal approach, " 'in the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.] If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual." (*Graham*, at p. 60.)

weapon must be considered acts of a most heinous nature," when defendant "committed the robbery offenses one after another unabated until he was captured after" the final robbery].)

Moreover, when considering the nature of the offenses in comparison to the length of the sentence, we note that the sentence of 500 years to life plus 146 years was based on 34 separate counts. Ramos's long prison sentence is proportionate to his offenses in light of the fact that the sentence results from a long *series* of crimes that took place over the course of five months involving numerous victims. (*Sullivan, supra,* 151 Cal.App.4th at p. 572 [rejecting constitutional challenge to sentence of 210 years to life because "appellant is not only a recidivist offender, he committed a *series* of current felonies"]; *Wallace, supra,* 14 Cal.App.4th at pp. 666-667 [sentence of 283 years and eight months was constitutional "given the nature and number of the offenses and the number of victims" when the defendant "committed 46 felonies, with enhancements"].)

With respect to the nature of the offender (*Lynch, supra,* 8 Cal.3d at p. 425), as the trial court pointed out, Ramos has engaged in a lifetime of criminal conduct, and he committed the instant crime spree a year after being discharged from parole. Ramos's criminal history fully supports the trial court's conclusion that Ramos is a danger to society. (*Ibid.* [the specific inquiry with respect to the nature of the offender focuses on "the degree of danger . . . to society"].) The danger that Ramos poses to society supports the conclusion that the lengthy sentence imposed by the trial court was not cruel and unusual. (*Sullivan, supra,* 151 Cal.App.4th at p. 570 [the inquiry into the nature of the offender supported the constitutionality of a sentence of 210 years to life because the defendant was "an incorrigible recidivist offender who presents a most grave and extreme level of danger to society"]; see also

43

*Ewing v. California* (2003) 538 U.S. 11, 29-30 [under Eighth Amendment analysis, the defendant's Three Strikes sentence was "justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and amply supported by his own long, serious criminal record"].)

The remaining inquiries under the California Constitution focus on whether crimes of a more serious nature receive lesser penalties in the same jurisdiction or whether the same crime is less harshly punished in other jurisdictions. (*Lynch, supra,* 8 Cal.3d at pp. 426-427.) However, Ramos makes no attempt to address these issues and does not offer any applicable points of comparison for analysis. We therefore treat those issues as abandoned and do not further consider them. (*Retanan, supra*, 154 Cal.App.4th at p. 1231 ["We note defendant makes no effort to compare his sentence with more serious offenses in California or with punishments in other states for the same offense, which we take as a concession that his sentence withstands a constitutional challenge on either basis."].)

We accordingly conclude that Ramos has not established that his sentence was so disproportionate to his crimes that it constitutes cruel and unusual punishment under either the state or federal Constitutions. The trial court was accordingly not required by constitutional principles of cruel and unusual punishment to grant the relief requested in Ramos's *Romero* motion.[18]

---

[18] In arguing that constitutional principles of cruel and unusual punishment should enter into a court's analysis of whether to grant a *Romero* motion, Ramos relies on our Supreme Court's statement that "a defendant's sentence is also a relevant consideration when deciding whether to strike a prior conviction allegation; in fact, it is the overarching consideration because the underlying purpose of striking prior conviction allegations is the avoidance of unjust sentences." (*People v. Garcia* (1999) 20 Cal.4th 490, 500.)

C.  *The One-Year Enhancement for Ramos's Prison Prior Must be Stricken Due to a Recent Statutory Amendment*

When Ramos was sentenced in 2019, the law provided for a one-year enhancement for each separate prior prison term served by the defendant. (Former § 667.5, subd. (b).) The trial court therefore imposed a one-year enhancement for Ramos's prior prison term.

Effective January 1, 2020, Senate Bill No. 136 amended section 667.5, subdivision (b). (Stats. 2019, ch. 590, § 1.) That section now limits one-year prior prison term enhancements to cases where the prior prison term was based on a sexually violent offense, as defined in Welfare and Institutions Code section 6600, subdivision (b). It is undisputed that Ramos's prior prison term was not for a sexually violent offense. Accordingly, Ramos is no longer within the class of offenders who are eligible for the additional one-year prior prison term enhancements under section 667.5, subdivision (b).

As the People acknowledge, because Ramos's judgment is not yet final, he is entitled to the benefit of the change in the law. (*People v. Jennings* (2019) 42 Cal.App.5th 664, 682; see also *In re Estrada* (1965) 63 Cal.2d 740.) Accordingly, the one-year enhancement for the prior prison term must be stricken.

---

This language lends support to the principle that, in deciding whether to grant a *Romero* motion, a trial court may consider whether the length of the sentence resulting from an application of the Three Strikes law would constitute cruel and unusual punishment. Here, however, because we have concluded that the sentence resulting from the application of the Three Strikes law does *not* result in cruel and unusual punishment, the trial court was within its discretion to deny the *Romero* motion, even taking into account the length of Ramos's sentence.

45

D.    *Pursuant to Section 954, the Trial Court Was Required to Strike Ramos's Conviction for Possessing a Concealed Firearm on His Person in Count 27*

We next consider an argument that concerns four counts that were based on Ramos's possession of a Ruger pistol on October 24, 2016, while he was fleeing from law enforcement and then assaulted a police officer.

Specifically, arising from his possession of the Ruger pistol on October 24, 2016, Ramos was convicted of the following counts:  count 27:  having a concealed firearm on his person (§ 25400, subd. (a)(2)); count 28:  having a concealed firearm in a vehicle (§ 25400, subds. (a)(1)); count 29:  carrying a loaded firearm on his person or in a vehicle (§ 25850, subd. (a)); and count 32:  possession of a firearm by a felon (§ 29800, subd. (a)(1)).[19]

Ramos contends that pursuant to section 954, because the four counts "are all based on the same act of possessing the same firearm," he should only have been convicted of one of the four counts, namely count 29 for which he received a sentence of 25 years to life.

1.    *Applicable Legal Principles*

In relevant part, section 954 states, "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . .  The prosecution is not required to elect between the different offenses or counts

_____

[19]    In count 27, a misdemeanor, the court sentenced Ramos to credit for time served.  In count 29, the trial court imposed a sentence of 25 years to life.  In count 28, the court imposed a six-year sentence to run concurrent to count 29.  In count 32, the court stayed the six-year sentence pursuant to section 654.

46

set forth in the accusatory pleading, but the defendant may be convicted of *any number of the offenses charged*, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court." (Italics added.) As our Supreme Court observed in *People v. Vidana* (2016) 1 Cal.5th 632, at page 650 (*Vidana*), the category of "different statements of the same offense" in section 954 is not referenced in the portion of the statute specifying the charges of which a defendant "may be convicted." Thus, " '[t]he most reasonable construction of the language in section 954 is that the statute authorizes multiple convictions for different or distinct offenses, but does not permit multiple convictions for a different statement of *the same offense* when it is based on the same act or course of conduct." (*Ibid.*, italics added.)

The question presented here is whether the four counts arising from Ramos's possession of the Ruger pistol on October 24, 2016, are convictions for different or distinct offenses, or whether, as Ramos contends, they are " 'multiple convictions for a different statement of *the same offense.*' " (*Vidana, supra*, 1 Cal.5th at p. 650, italics added.) If they are different statements of the *same* offense, Ramos may be convicted of only one of them. (*Ibid.*) "We review, de novo, the issue of whether multiple convictions are proper under section 954." (*People v. Duffy* (2020) 51 Cal.App.5th 257, 261.)

The People concede that count 27 and count 28 are different statements of the same offense, and as we will explain, we agree. Count 27 is the offense of having a concealed firearm on one's person (§ 25400, subd. (a)(2)), and count 28 is the offense of having a concealed firearm in a vehicle (§ 25400, subd. (a)(1)). Section 25400 states: "(a) A person is guilty of carrying a concealed firearm when the person does any of the following: [¶] (1) Carries concealed within any vehicle that is under the person's control or direction

47

any pistol, revolver, or other firearm capable of being concealed upon the person. [¶] (2) Carries concealed upon the person any pistol, revolver, or other firearm capable of being concealed upon the person. [¶] (3) Causes to be carried concealed within any vehicle in which the person is an occupant any pistol, revolver, or other firearm capable of being concealed upon the person."

In *Duffy* our colleagues in the Third District examined the statutory language of section 25400, its legislative history, and the case law interpreting a similar statute to conclude that the crime of carrying a concealed firearm on one's person and the crime of carrying a concealed firearm in a vehicle do not describe separate offenses. (*Duffy, supra,* 51 Cal.App.5th at pp. 263-266.) As *Duffy* explained, when a defendant's convictions for both of those crimes arise from the same set of facts, a defendant may violate section 25400, subdivision (a) "only once and can be convicted only once for this crime." (*Id.* at p. 266.) We agree with *Duffy*'s conclusion and apply it here. Accordingly, Ramos should have been convicted of only count 28, not count 27.[20]

However, Ramos has cited no authority for the proposition that the crimes of having a concealed firearm (§ 25400, subd. (a)(1) & (a)(2)), carrying a loaded firearm (§ 25850, subd. (a)), and being a felon in possession of a firearm (§ 29800, subd. (a)(1)) are different statements of the same offense. On the contrary, our Supreme Court has expressly stated that those three weapons-based crimes constitute *separate* offenses for the purpose of section 954. "The Legislature has defined *three separate weapons offenses*:

---

20  Ramos identifies count 28 as the count that should survive in the event that any counts are stricken pursuant to section 954, and the People do not take issue with that approach.

48

possessing a firearm by a felon, carrying a concealed firearm, and carrying a loaded firearm in a public place." (*People v. Reed* (2006) 38 Cal.4th 1224, 1230, italics added.) As explained in *Reed*, under section 954, a defendant may be convicted of all three of these crimes, even if they all arise from the same conduct. (*Ibid.* ["Defendant committed each of these crimes, albeit during the same course of conduct. The Legislature has made clear that a defendant may be convicted of more than one offense even if they arise out of the same act or course of conduct. (§ 954.)"].) Accordingly, there is no merit to Ramos's contention that the convictions in count 29 for carrying a loaded firearm (§ 25850, subd. (a)) and in count 32 for possession of a firearm by a felon (§ 29800, subd. (a)(1)) should be stricken because they are the same offense as the conviction in count 28 for having a concealed weapon (§ 25400, subd. (a)(1)).

We will therefore order that the conviction in count 27 for having a concealed firearm on one's person (§ 25400, subd. (a)(2)) be stricken, but we grant no relief as to counts 29 and 32.

E.   *A Remand is Required For the Trial Court to Consider Ramos's Ability to Pay Prior to Imposing Certain Fines and Fees*

At sentencing, the trial court ordered Ramos to pay certain fines and fees. Specifically, as relevant here, these included: a $300 restitution fine (§ 1202.4, subd. (b)); a court operations fee totaling $1,360 ($40 per conviction, multiplied by Ramos's 34 separate convictions) (§ 1465.8); and a facilities fee totaling $1,020 ($30 per conviction) (Gov. Code, § 70373). The trial court imposed these fines and fees over defense counsel's request that the court hold a hearing on Ramos's ability to pay before imposing them. The trial court also made an order requiring Ramos to pay over $100,000 in victim restitution, reserving jurisdiction to order restitution for numerous other victims.

Ramos contends that the trial court's imposition of the $300 restitution fine, the $1,360 court operations fee, and the $1,020 facilities fee, without considering whether he has the ability to pay them, were made in violation of his right to due process and his right to be free from excessive fines under the United States and California Constitutions. Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Ramos contends that the imposition of those fines and fees "must be reversed unless the People demonstrate that [he] has the present ability to pay them."

*Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373" and that, "although . . . section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) Numerous subsequent cases have addressed the issue presented in *Dueñas*, including case law expressing the view that the appropriate analysis for punitive fines should be based on the Excessive Fines Clause of the Eighth Amendment and its counterpart in the California Constitution (Cal. Const., art. I, § 17), rather than on principles of due process. (See, e.g., *People v. Kopp* (2019) 38 Cal.App.5th 47, 94, review granted Nov. 13, 2019, S257844 (*Kopp*); *People v. Cowan* (2020) 47 Cal.App.5th 32, 43, review granted June 17, 2020, S261952 (*Cowan*).)

The validity of *Dueñas, supra*, 30 Cal.App.5th 1157 is unsettled and will be decided by our Supreme Court in currently pending cases. (E.g.,

*Kopp*, *supra*, 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.) In their respondent's brief, the People set forth their position on the validity of *Dueñas* and the case law subsequently discussing it. According to the People, based on their view of how the issues raised in *Dueñas* should be resolved by our Supreme Court, *Ramos* is not entitled to relief.

First, the People contend that Ramos's $300 restitution fine is a form of punishment that should be analyzed under the Excessive Fines Clause of the Eighth Amendment and its counterpart under the California Constitution (Cal. Const., art. I, § 17), not under constitutional principles of due process. As the People point out, the inquiry to determine whether a fine is constitutionally excessive focuses on whether the fine is grossly disproportionate to the offense. (*United States v. Bajakajian* (1998) 524 U.S. 321, 337-338; *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728 (*R.J. Reynolds*).) According to the People, there is no gross disproportionality in imposing a $300 restitution fine in light of Ramos's extensive criminal conduct and conviction on 34 separate counts.

With respect to the $1,360 court operations fee and the $1,020 facilities fee, the People do "not dispute the *Dueñas* opinion insofar as it holds the imposition of non-punitive fees and assessments violates due process where a defendant demonstrates an inability to pay them." Placing the court operations and facilities fees in the category of nonpunitive fees, the People do "not seek to uphold the imposition of these assessments on those who have no ability to pay them." Although conceding that the trial court erred in not considering Ramos's ability to pay, the People contend that Ramos is nevertheless not entitled to relief because the trial court's error in failing to consider Ramos's ability to pay the fees is harmless beyond a reasonable doubt. (See *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035 (*Jones*) [a

court's failure to consider a defendant's ability to pay under *Dueñas* does not require reversal if it is harmless beyond a reasonable doubt].)  Specifically, the People argue that Ramos has the ability to pay $2,380 in fees because of the wages he will earn in prison.[21]  They also observe that Ramos appears to have had financial resources at the time he was arrested, as he owned a truck, among other things, and had funds to rent a hotel room and pay a cell phone bill.

In light of the People's concession that the analysis set forth in *Dueñas* applies to the imposition of the court operations fee and the facilities fee, we do not, and need not, comment on the merits of *Dueñas*.  Pending final word from our Supreme Court, for the purposes of resolving the instant appeal we will take the approach agreed upon by both the People and Ramos.  We therefore assume, without deciding, that a court is required, upon request by the defendant, to consider the defendant's ability to pay, as set forth in *Dueñas*, when imposing a court operations fee or facilities fee.

---

[21]    The People's detailed calculation of how much would be left from Ramos's prison wages, after deduction for victim restitution and administrative fees, does not impress us as showing that Ramos indisputably would have the financial resources over his lifetime to pay the court operations and facilities fees.  The People explain that "prison wages can range from $12 to $36 per month, and, if [a prisoner] has special skills, up to $48 per month."  (See *Jones, supra,* 36 Cal.App.5th at p. 1035 [explaining rules governing prison wages].)  They then calculate, "[Ramos's] current sentence is 646 years to life in prison.  The total amount [Ramos] has to pay for his assessments is $2,380.  At $12 a month [Ramos] would have earned $5,328 after serving 37 years in prison.  When taking into account the 10 percent administrative fee and the 50 percent wage deduction [for victim restitution] approximately $2,397 would still remain, enough money for [Ramos] to pay for the assessments."  We do not find this calculation to be persuasive as to Ramos's ability to pay the fees because it assumes, without foundation, an additional 37 years during which Ramos is physically able to work.

Although we follow the lead of the parties in concluding that the trial court erred in not granting defense counsel's request to consider Ramos's ability to pay prior to imposing the court operations and facilities fees, we reject the People's harmless error analysis. Specifically, we do not agree that the trial court's failure to hold a hearing on Ramos's ability to pay pursuant to *Dueñas* was harmless beyond a reasonable doubt. In our assessment, neither Ramos's ability to earn prison wages, nor the fact that he appears to have had financial resources at the time of his arrest, conclusively establishes that Ramos is able to pay the $2,380 in fees. Significantly, as the People's own calculation of Ramos's lifetime potential to earn prison wages demonstrates, Ramos's significant victim restitution obligations may have a meaningful impact on his ability to pay his other obligations, and there is no guarantee that he will be physically able to engage in 37 years of wage-earning work. Therefore, the ability-to-pay analysis should not focus solely on Ramos's potential to earn prison wages. Further, we reject the People's suggestion that we look to evidence presented at trial about Ramos's prior lifestyle to conclude that he has sufficient financial resources. That approach does not supply the best method of determining Ramos's current financial condition. We note that because the error at issue here involves the trial court's failure to allow Ramos to develop a factual record concerning his inability to pay, it is particularly difficult for us to conclude, on a silent record and without engaging in unwarranted speculation, that Ramos indisputably will be able to pay $2,380 in fees. We therefore remand this matter with directions that the trial court hold a hearing on Ramos's ability to pay the court operations and facilities fees.

With respect to the restitution fine, both the People and Ramos agree that, at a minimum, the Eighth Amendment's Excessive Fines Clause (and

California's counterpart) governs the question of whether a punitive fee may be imposed on a defendant. "California courts have . . . held that ability to pay is relevant to excessiveness, and they have done so in applying both the Eighth Amendment and article I, section 17 of the California Constitution." (*Cowan, supra,* 47 Cal.App.5th at p. 47, review granted [citing *R.J. Reynolds, supra,* 37 Cal.4th at p. 728].) Thus, Ramos's ability to pay is relevant, along with other factors, to deciding whether the $300 restitution fine should be imposed. (*R.J. Reynolds, supra,* 37 Cal.4th at p. 728 [identifying four considerations bearing on proportionality: "(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay."].) We remand for the trial court to make that determination.

## DISPOSITION

This matter is remanded to the trial court with directions to strike (1) the one-year enhancement for Ramos's prior prison term (former § 667.5, subd. (b)), and (2) the conviction for having a concealed firearm on his person (§ 25400, subd. (a)(2), count 27). Ramos shall be resentenced accordingly. Further, the imposition of the court operations fee (§ 1465.8), the facilities fee (Gov. Code, § 70373), and the restitution fine (§ 1202.4, subd. (b)) is reversed, and the trial court is directed to hold a hearing at which it shall consider Ramos's ability to pay in determining whether to impose those fines and fees. An amended abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

IRION, J.

WE CONCUR:

BENKE, Acting P. J.

GUERRERO, J.